UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

JULIO RAMIREZ,

                Plaintiff,


     -against-                             <u>MEMORANDUM AND ORDER</u>
                                             03 - CV - 4765

NEW YORK CITY BOARD OF
EDUCATION,

                Defendant.

-------------------------------------------------x

GLASSER, United States Senior District Judge

## **INTRODUCTION**

       Plaintiff Julio Ramirez ("Ramirez" or "plaintiff") brought this action against his former-employer, defendant New York City Board of Education (the "Board"),[1] alleging disability discrimination in violation of the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act of 1993 ("FMLA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). The Board now moves for summary judgment against Ramirez pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons explained below, the Court grants the Board's motion.

---

1      Novlett-Morgan, Ramirez's supervisor, testified that the Board has been renamed the New York City Department of Education (the "Department of Education"). <u>See</u> Decl. of R. Elizabeth Urena, Esq. ("Pl.'s Decl."), Ex. L at 25:15-22. Since the facts relevant to this motion for summary judgment took place before the name change, this memorandum and decision will refer to the Board. Regardless, this Court recognizes that the two names are synonymous for the same entity – the Department of Education.

## FACTS

Unless otherwise indicated, the facts set forth below are undisputed.[2]

Ramirez was hired as a Provisional Preparatory Teacher ("PPT") by the Board. See Def.'s 56.1 Statement ¶ 1. The Collective Bargaining Agreement between the Board and the United Federation of Teachers defines a PPT as "a person who has not yet completed all the requirements for New York State provisional certification, but who holds a New York State Temporary License." Def.'s 56.1 Statement ¶ 2; Declaration of Cindy E. Switzer ("Def.'s Decl."), Ex. G. Prior to February 1, 2003, a PPT was permitted to teach for a period of three years without full certification. The renewal of the license to teach each year was dependent on receiving a satisfactory rating from the school at which the PPT was assigned.[3] See id. Ramirez taught Spanish at August Martin High School ("August Martin") from September 1996 through June 2001. Ramirez was classified as a PPT because during the period in question he had not passed either the Liberal Arts and Sciences Test (LAST) or the Assessment of Teaching Skills-Written

---

2       Plaintiff opines that this Court may not consider the exhibits attached to the Board's moving papers on this motion because they are neither sworn nor certified. See Pl.'s Br. at 4-5. The Court finds this argument unavailing. The Board's attorney offered a declaration stating under penalty of perjury that it is true and correct. See Def.'s Decl. The declaration was offered for the sole purpose of attaching exhibits in support of the Board's motion for summary judgment. The only deficiency in the declaration is that it did not state that the attached exhibits are true and accurate copies of the originals. However, pursuant to Federal Rule of Evidence 1003, the duplicate copies of the deposition transcripts and exhibits may be considered because they were recorded by a notary public and Ramirez has not raised any issues with respect to the authenticity of the original documents. The declaration itself exhibits sufficient indicia of reliability, and thus, the Court may consider the copies.

3       The New York State Education Department amended the regulations to provide that, effective February 1, 2003, it would no longer issue state temporary licenses. The definition of PPT from the Collective Bargaining Agreement was effective during the dates at issue. See Def.'s Br. at 24.

(ATS-W), both of which are required for full certification in New York.  <u>See</u> Def.'s 56.1 Statement ¶ 2; Def.'s Decl., Ex. D.

**<u>Epilepsy</u>**

Ramirez was first diagnosed with epilepsy while he was living in the Dominican Republic, approximately eleven years before he started teaching at August Martin.  <u>See</u> Def.'s 56.1 Statement ¶ 25; Def.'s Decl., Ex. A at 42:14-14.  According to Ramirez, the diagnosing physician's sole recommendation was that he "stay out of difficult violent loud situations; but place[ ] [himself] in situations where [he] felt relaxed, tranquil and secure." Def.'s Decl., Ex. A at 44:7-10.  Ramirez testified that after 1985 he suffered between ten and fifteen minor convulsions per year.  <u>See</u> <u>id.</u> at 54:2-23.  In 1994, Ramirez was prescribed Dilantin, an anti-epileptic medication, to prophylactically control the seizures.  <u>See</u> <u>id.</u> at 54:24-55:11.  On June 8, 2001, Ramirez experienced his first and only epileptic seizure while at work.  <u>See</u> <u>id.</u> at 68:7-9, 95:12-96:8.

**<u>Depression</u>**

Ramirez was diagnosed with depression in April 2001, at which time he was prescribed Celaxa.  <u>See</u> <u>id.</u> at 30:12-31:3.  Ramirez stated that he began feeling symptoms of depression in September of 1996, but that the symptoms worsened after he was hit on the head with a newspaper by a student on March 23, 2001.  <u>See</u> <u>id.</u> at 38:10-25; Affidavit of Julio Ramirez ("Pl.'s Aff.") ¶ 14.  Ramirez testified that he "didn't have a great depression" while employed at Augustin Martin.  <u>Id.</u> at 33:2.  In response to the question, "So in your opinion your symptoms were under control at the time you were working for the Board of Ed," Ramirez replied, "The job of being an educator satisfies

me wherever I am and whatever I'm doing. There's really no place for one to be thinking of one's own problems. . . . The job helped me to control it." Id. at 33:3-13. Ramirez further explained that when he was working, the "depression practically disappear[ed]." Id. at 34:3.

**High Blood Pressure**

Ramirez experienced his first episode of arrhythmia in February 1998. See id. at 77:12-78:11. In May of 1998, Ramirez returned to the hospital where he was diagnosed with high blood pressure and prescribed Zocor. See id. at 77:19-85:11. Ramirez testified that his symptoms consist of moments when he feels his "heart beat too rapidly during several minutes and that this repeats itself and can repeat itself at any moment even if [he is] lying down to go to sleep." Id. at 82:18-21. Ramirez suffered from approximately eight to twelve episodes of arrhythmia while working at August Martin. Id. at 87:14-16. Ramirez testified that on these occasions he would experience pain for several hours that would require him to lie down. See Def.'s Decl., Ex. F. at 13:8-12. He testified that, after the first attack in 1998, he "knew . . . how to face the situation. . . . That I should feel satisfied with that which I did and not worry so much. . . ." Def.'s Decl., Ex. A at 85:14:19. Ramirez stated that Zocor "helped [ ] a lot" to alleviate the arrhythmia. Id. at 85:11.

**Ramirez's Absences**

Ramirez was absent for fifty-two days during the 1999-2000 school year. See Def.'S 56.1 Statement ¶ 9; Def.'s Decl., Ex. Q. Ramirez claims that forty-three of those

absences were taken pursuant to applied-for FMLA leave.[4]  <u>See</u> Def.'s Decl., Exs. H and I; Pl.'s 56.1 Counter Statement ¶ 9.  Ramirez's absences from April 5-17, 2001, were the only absences for which he submitted supporting documentation.  Those documents stated that during his absence he experienced "Parkinson's-like syndrome, [Hyper-tension], Anxiety, [and] Depression."  Def.'s 56.1 Statement ¶ 8; Def.'s Decl., Ex. J. August Martin's principal, Geraldine Taylor-Brown, rated Ramirez's performance satisfactory on the Annual Professional Performance Review and Report on Probationary Service of Pedagological Employee (the "Annual Review and Report") for the 1999-2000 school year.[5]  <u>See</u> Def.'s Decl., Ex. Q.

Ramirez was absent for forty-two days during the 2000-2001 school year.[6]  <u>See</u> Def.'s 56.1 Statement ¶ 11; Def.'s Decl., Ex. R.  According to documents submitted by Ramirez from his physician, six days of absence between January 24-February 12, 2001, were due to "[a]cute Bronchitis and [upper respiratory infection]."  Def.'s Decl., Ex. M. The eleven days of absence between April 2-23, 2001, were due to "upper airway infection with bronchitis."  Def.'s Decl., Ex. N; <u>see also</u> Def.'s Decl., Ex. O.  Six additional days of absence were due to "high blood pressure."  Def.'s Decl., Ex. P.  There are nineteen outstanding absences for which Ramirez did not submit medical

---

4       The FMLA allows eligible employees to take twelve weeks of unpaid leave during any twelve month period for a "serious health condition that makes the employee unable to perform the functions of the position of the employee."  29 U.S.C. § 2612(a)(1)(D).

5       The criteria against which Ramirez was evaluated included the "personal and professional qualities" of "[a]ttendance and punctuality."  <u>Id.</u>

6       Ramirez and the Board dispute whether Ramirez applied for FMLA leave for any of his absences during the 2000-2001 school year.  <u>See</u> Def.'s 56.1 Statement ¶ 11; Pl.'s 56.1 Counter Statement ¶ 11.

documentation until after he received the unsatisfactory rating.  See Def.'s Decl., Ex. T. Ramirez states that fourteen of these absences were caused by a student who struck Ramirez on the head with a rolled-up newspaper.  See Pl.'s Aff. ¶ 14; Pl.'s 56.1 Counter Statement ¶ 11.

### Termination of Ramirez's Employment at August Martin

Taylor-Brown rated Ramirez's performance unsatisfactory on the Annual Review and Report for the 2000-2001 school year.  See Def.'s Decl., Ex. R.  Ramirez acknowledged receipt of the rating by signing the Annual Review and Report on June 22, 2001.  See id.  Due to the terms of the Collective Bargaining Agreement, Ramirez could not maintain his PPT status after he was rated unsatisfactory, and as a result, August Martin "terminated" Ramirez.[7]  See Def.'s Decl., Ex. G.

Ramirez avers that he received mailings from August Martin during the summer of 2001 in anticipation of the upcoming school year.  See Pl.'s Aff. ¶ 2.  Ramirez stated that he showed up for work on September 4, 2001, and on the first day of teaching, September 6, he complained to his supervisor, Novlett-Morgan, that he did not have a teaching schedule.  See id. ¶¶ 3, 4.  Novlett-Morgan told Ramirez to speak with Taylor-Brown, who informed Ramirez that he would have to discuss the matter with the superintendent because he did not believe that the school had a job for Ramirez.  See id. ¶ 5.  That same day, Ramirez spoke with his union representative who advised him that

---

[7]      The parties dispute the exact date that Ramirez's employment at August Martin was terminated. As explained below, the Court finds that Ramirez was notified of the termination by September 6, 2001, when he was told that there was no longer a teaching position available for him.  The Court need not decide at this time whether the date on which Ramirez was notified of the unsatisfactory rating, June 22, 2001, constituted official notice of the termination.

he did not have a job, and that he should speak with the superintendent and appeal the unsatisfactory rating. See id. ¶ 6. Later that day, Ramirez met with the superintendent, who confirmed that Ramirez no longer had a job at August Martin due to the unsatisfactory rating, but that he could appeal the unsatisfactory rating to the Chancellor's Committee. See id. ¶ 8.

Ramirez instituted an appeal by way of letter on September 6, 2001. See Pl.'s Aff. ¶ 7, Ex. B. The Chancellor's Committee held a hearing on February 14, 2002, and soon thereafter issued its recommendation that the "appeal be denied and the rating of 'Unsatisfactory' be sustained." Def.'s Decl., Ex. K. The report published by the Chancellor's Committee summarized Taylor-Brown's testimony at the hearing, which stated in pertinent part:

> Ramirez's excessive absence broke the continuity of instruction for 150 students in his classes. Regents diplomas for these students were put in jeopardy. . . . The Appellant's absences affected the academic success of the students. The Appellant performs well in the classroom but he has to be there in order to deliver his services. . . . The "U" rating reflects too frequent disruptions of instruction.

Id. The Chancellor's Committee found that, while Ramirez's "teaching abilities [were] good," the unsatisfactory rating was based "solely on excessive absence." Id. The Chancellor's Committee further explained that the "fact that the absences are excused or that they fall within the teacher's allowance of self-certified sick days, has no bearing on the issue of excessive absence. . . . it is not the responsibility of the Rating Officer to prove that a teacher's absence is disruptive to the school's organization. It is presumed

that every absence by a teacher whether excused or not, whether reported or not, is disruptive to the school and injurious to the children's education."  Id.

## DISCUSSION

### Standard of Review

Summary judgment is appropriate when there are "no genuine issues as to any material fact[s] and that the moving party is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56 (c); see Matsushita Elec. Indus Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  A genuine issue exists if a reasonable jury could find in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party has the burden to demonstrate that no genuine issue of material fact exists, and the Court must draw all reasonable inferences in favor of the non-moving party.  Id. at 255.  The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."  D'Amico v. City of New York, 132 F.3d 145, 149 (2d. Cir. 1998); see Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (explaining that a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.").

The Court's role in a motion for summary judgment is one of "issue-finding," not "issue-resolution."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  Therefore, the Court's charge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

8

The Second Circuit applies the same summary judgment standard in employment discrimination cases.  See Morris v. City of New York, 153 F.Supp.2d 494, 501 (S.D.N.Y. 2001).  Motions for summary judgment in employment discrimination actions are rarely granted because "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence . . . . Consequently . . . where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate."  Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) (citations omitted); see also Gallo, 22 F.3d at 1224 (a "trial court must be cautious about granting summary judgment to an employer when . . . intent is at issue.").

Nonetheless, summary judgment "remains available to reject discrimination claims in cases lacking genuine issues of material fact."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994).  The purpose of summary judgment would be "rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).  The ADA "does not erect an impenetrable barrier around the disabled employee preventing the employer from taking any employment actions vis-a-vis the employee."  Arnold v. City of Appleton, Wisc., 97 F.Supp.2d 937, 943 (E.D. Wis. 2000). Where, as in the instant case, the employment discrimination claim is grounded in the ADA, the plaintiff must show that he is "disabled" within the meaning of the ADA as part of his *prima facie* case before intent or state of mind may be considered.  See Reeves v. Johnson Controls World Servs., 140 F.3d 144, 149-50 (2d Cir. 1998); see also Ryan v.

Grae & Rybicki, P.C., 135 F.3d 867, 869 (2d Cir. 1998). Therefore, if a plaintiff fails to prove that he is disabled under the ADA, the Court "must grant summary judgment for the defendant, without considering whether there are factual questions as to discrimination or pretext." Batac v. Pavarini Constr. Co., Inc., No. 03 Civ. 9783 (PAC), 2005 WL 2838600, at *2 (S.D.N.Y. Oct. 27, 2005).

For the reasons explained more fully below, the Court finds that plaintiff is not disabled within the meaning of the ADA, and therefore, summary judgment for the Board is appropriate.

## Disability Discrimination Under the ADA

The ADA provides that

> [n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). To establish a *prima facie* case under the ADA, a plaintiff must show that (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability.[8] See

---

8     Courts in the Second Circuit apply the burden-shifting analysis of Title VII employment discriminations claims set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny, to claims brought under the ADA. See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998). Therefore, the plaintiff bears the burden of proving a *prima facie* case by a preponderance of the evidence. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). If the plaintiff is successful, the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000). If the defendant is successful, the presumption of discrimination has been rebutted, and the burden then shifts back to the plaintiff to prove that those "legitimate" reasons were a pretext for discrimination. Hicks, 509 U.S. at 507-508. Because, as discussed in further detail below, Ramirez has not set forth a *prima facie* case, the burden-shifting analysis is not applicable.

Reeves, 140 F.3d at 149-50. Plaintiff has failed to meet this burden because he has not established either the second or the third prong.

## "Disabled" Within the Meaning of the ADA

The ADA defines disability as "(1) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; or (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12101(2).[9] The Supreme Court has admonished courts to interpret "disability" under the ADA "strictly" in order to "create a demanding standard for qualifying as disabled . . . ." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002). Whether a person is disabled under the ADA is a fact specific inquiry which must be made on a case-by-case basis. See Reeves, 140 F.3d at 151.

In evaluating disability, courts follow the three-step process set forth by the Supreme Court in Bragdon v. Abbot to determine: "(1) whether plaintiff had an impairment; (2) whether the impairment affected a 'major life activity' within the meaning of the ADA; and (3) whether that major life activity was substantially limited by the impairment." Mazza v. Bratton, 108 F.Supp.2d 167, 173 (E.D.N.Y. 2000) (citing Bragdon v. Abbot, 524 U.S. 624, 631 (1998)). Therefore, "[m]erely having an impairment does not make one disabled for purposes of the ADA." Toyota, 534 U.S. at

---

9       The major life activities that fall within the ambit of the ADA are "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(h)(2)(i). Though not binding authority, courts "accord great deference to the [Equal Employment Opportunity Commission's] interpretation of the ADA [codified as 29 C.F.R. § 1630], since it is charged with administering the statute." Reeves, 140 F.3d at 150 & n.3 (quotation omitted).

195.  As a threshold matter, the plaintiff bears the burden of demonstrating that his disability fits into the narrow definition envisioned by the ADA.  The impairment must "*substantially*" limit one of the major life activities such that the "impairment must be significant, and not merely trivial."  Reeves, 140 F.3d at 151 (quotation omitted) (alteration in original); see also Ryan, 135 F.3d at 870 ("[I]n assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments which merely affect major life activities from those that substantially limit those activities.").

To prove a substantial limitation on the major life activity of working, a plaintiff must show that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(i); see also Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 523 (1999).  The "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  Id.  Factors taken into consideration pursuant to the substantial limitation calculus include:  "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; [and] (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."  Boyce v. New York City Mission Soc'y, 963 F.Supp. 290, 296 (S.D.N.Y. 1997) (citing 29 C.F.R. § 1630.2(j)(2)).  Temporary, non-chronic impairments of short duration are "usually not disabilities."  Id.

### Ramirez's Impairments

Ramirez's impairments during the 2000-2001 school year do not rise to a level of substantially limiting Ramirez from the major life activity of working. To support his FMLA leave, Ramirez produced documentation from a physician that he suffered from acute bronchitis and an upper respiratory infection that caused him to miss seventeen days of school. <u>See</u> Def.'s Decl., Exs. M and N. None of these temporary conditions can support a claim under the ADA as they are not substantially limiting disabilities. <u>See</u> <u>Murphy</u>, 527 U.S. at 523.

Ramirez produced documentation that he missed six days of school due to "high blood pressure." Def.'s Decl., Ex. P.[10] However, evidence of impairment alone does not establish disability.[11] <u>See, e.g.</u>, <u>Batac</u>, 2005 WL 2838600, at *4 ("Heart disease alone does not establish a disability per se.") (citations omitted). To assess whether the impairment substantially limited Ramirez, the Court must take into account how his alleged impairments affected his ability to work.

---

10    Ramirez only sought to account for the remaining nineteen days of absences *after* he received the unsatisfactory rating. Therefore, in assessing whether Ramirez's ability to work was substantially limited by any of the impairments that Ramirez suffered during this time, the Court will not consider any documentation offered after Taylor-Brown rated Ramirez unsatisfactory because none of this documentation would have been taken into account by Taylor-Brown as part of his employment decision. It is worth noting, however, that the vast majority of these absences were not related to any of the disabilities that Ramirez has alleged, but to an attack by a newspaper-wielding student. Ramirez has not alleged that this incident caused him any disability.

11    It is unclear from the record whether Ramirez's episodes of arrhythmia were caused by his high blood pressure or whether the two stemmed from separate causes. Ramirez stated that he was prescribed Zocor for his high blood pressure when he sought medical attention for an episode of arrhythmia in 1998. Because Ramirez testified that the Zocor helps to alleviate his symptoms of arrhythmia, and in order to make all inferences in favor of the plaintiff, the Court will treat his symptoms of arrhythmia along with his high blood pressure in determining whether this impairment rises to the level of substantially limiting his ability to work.

Ramirez controlled his blood pressure and episodes of arrhythmia by taking Zocor. The Supreme Court has explained that if mitigating measures can be taken to correct an impairment, then such impairment does not constitute a disability within the meaning of the ADA. In <u>Sutton v. United Air Lines, Inc.</u>, the Court wrote, a disability exists only where "an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." 527 U.S. 471, 482-83 (1999). Courts may also consider the "duration or expected duration of the impairment" in making a disability determination under the ADA. <u>Batac</u>, 2005 WL 2838600, at *7. Because the Zocor "helped [ ] a lot" to alleviate Ramirez's symptoms, Def.'s Decl., Ex. A at 85:11, and Ramirez only suffered approximately eight to twelve episodes of arrhythmia between 1998 and 2001 which required him to lie down for a few hours, <u>id.</u> at 87:14-16, Def.'s Decl., Ex. F. at 13:8-12, Ramirez was not substantially limited in his ability to work due to either his high blood pressure or arrhythmia.

None of the documentation that Ramirez produced to the Board during the 2000-2001 school year indicates that any of his absences were caused by epilepsy or depression. Ramirez took medication to control the effects of his epilepsy, and thus the Court must assess Ramirez's condition taking into account the prophylactic effect of his prescription medication for epilepsy, Dilantin. <u>See</u> <u>Sutton</u>, 527 U.S. at 482-83. Ramirez testified that the effects of his epilepsy were minimal; his only seizure at August Martin

occurred on June 8, 2001, and he did not seek medical attention for most of the seizures he experienced over the years.  <u>See</u> Def.'s Decl., Ex. A at 54:20-23, 68:7-9, 95:12-96:8. Thus, Ramirez's epilepsy did not substantially impair his ability to teach.  <u>See</u> <u>Todd v. Academy Corp.</u>, 57 F.Supp.2d 448, 453-54 (S.D. Texas 1999) (finding terminated employee, who suffered from epilepsy for thirty-seven years, was prescribed medicine to control his epilepsy, and experienced approximately eight light seizures during the five months of his employment, not substantially limited because he only "suffer[ed] from momentary physical limitations"); <u>see also</u> <u>Charneco v. Dep't of Educ.</u>, No. 04 Civ. 1848 (AKH), 2006 WL 148934, at *3 (S.D.N.Y. Jan. 18, 2006) (granting summary judgment on ADA claim where plaintiff conceded that her "epilepsy did not impair her ability to work and that she never suffered from any epileptic seizures while at work.").

For these same reasons, Ramirez's depression cannot support his ADA claim. There is no genuine issue of material fact regarding the extent of Ramirez's depression while working at August Martin.  Ramirez testified that working helped him to "control" the depression, and that when he was working the "depression practically disappear[ed]."  Def.'s Decl., Ex. A at 34:3.  Moreover, Ramirez was prescribed Celaxa to combat the depression.  <u>See</u> <u>Horwitz v. L. & J.G. Stickley. Inc.</u>, 122 F.Supp.2d 350, 355 (N.D.N.Y. 2000) (finding medicated plaintiff with bi-polar disorder not disabled within meaning of ADA, even though her disability was "expected to continue indefinitely and she will be required to take medication and undergo therapy for the rest of her life,"

because the disease did "not substantially interfere with her major life activities").[12] Therefore, Ramirez's depression did not substantially impair his ability to teach.

## <u>"Regarded as Having" an Impairment</u>

In the alternative, Ramirez argues that even if he did not have a disability within the meaning of the ADA, he was "regarded" as disabled by his employers. A person is "regarded as having" an impairment if he "(1) [h]as a physical or mental impairment that does not substantially limit major life activities but is treated by [an employer] as constituting such limitation; (2) [h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) [h]as none of the impairments . . . but is treated by [an employer] as having a substantially limiting impairment." 29 C.F.R. § 1630.2(l). Whether an individual is regarded as having a disability "turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability." <u>Colwell v. Suffolk County Police Dep't</u>, 158 F.3d 635, 646 (2d Cir. 1998) (internal quotations omitted). Plaintiff must therefore prove that his employer regarded him as disabled under the ADA, *i.e.*, that plaintiff's supervisors

---

12    Ramirez also alleges that Novlett-Morgan subjected him to a "stressful" and "hostile work environment" by forcing him to teach consecutive ninth grade classes, "thereby increasing [his] blood pressure and increasing the likelihood that [he] would suffer from a seizure." Pl.'s Compl. ¶¶ 21-22. For the reasons explained above, the Court finds that Ramirez was not disabled under the ADA due to either his epilepsy or high blood pressure. To the extent that stress was a contributing factor to any of Ramirez's alleged ailments, the Court will not consider any workplace induced stress or anxiety as a separate impairment. <u>See</u> <u>Bowen v. Niagara Mohawk Power Corp.</u>, No. 02 CV 749, 2006 WL 3096487, at *6 (N.D.N.Y. Oct. 30, 2006) (explaining that "[w]orkplace induced stress and anxiety related conditions are not *per se* disabilities under the ADA," and therefore, "to the extent [plaintiff's] stress and anxiety independently contributed to plaintiff's work limitations, they cannot be considered.").

perceived him as substantially limited in the major life activity of working.  Reeves, 140 F.3d at 153.[13]

Principal Taylor-Brown testified that prior to September 25, 2001, he was not aware that Ramirez had epilepsy, though he was aware that Ramirez had both depression and high blood pressure.  See Pl.'s Decl., Ex. K at 59:25-61:8, 62:20-23.  Novlett-Morgan testified that she first learned that Ramirez suffered from epilepsy on June 8, 2001, see id., Ex. L at 60:22-26; Ramirez disputes this fact.  See Def.'s Decl., Ex. A at 68:10-21.  Novlett-Morgan stated that she knew Ramirez had high blood pressure because she saw him taking pills in 2000 and questioned him about it.  See id. at 62:10-23.  She also testified that she was cognizant that Ramirez suffered from depression because Ramirez told her about his condition during the 2000-2001 school year.  See id. at 61:21-62:9.

Any awareness that Ramirez suffered from any of the alleged ailments is inconsequential.  Mere knowledge is insufficient to prove "either that the employer regarded the employee as disabled or that the perception caused the adverse employment action."  See Reeves, 140 F.3d at 153 (quotation omitted).  Ramirez is required to show that his employers perceived him as being substantially limited in his ability to work due to his impairments.  Drawing all reasonable inferences in favor of

---

13      Ramirez contends that the Board should not be permitted to argue that Taylor-Brown was unaware that Ramirez suffered from an impairment because he granted Ramirez leave under the FMLA. This fact alone is not dispositive of whether Ramirez was regarded as substantially limited from working. See, e.g., Kramer v. Hickey-Freeman, Inc., 142 F.Supp.2d 555, 560 (S.D.N.Y. 2001) (granting summary judgment where court found that plaintiff's employer did not perceive him as disabled despite allowing plaintiff to take FMLA leave for his bipolar disorder).

Ramirez, this Court does not find that either Ramirez's direct supervisor or the principal viewed Ramirez as substantially impaired in his ability to teach. Taylor-Brown testified that Ramirez "taught when he was present and it was instructionally sound for all of the students in the classroom." Pl.'s Decl., Ex. K at 19:15-18. Novlett-Morgan testified that while she thought that Ramirez's style of teaching was rather "didactic" and that he was "impatient with the kids," he was nonetheless a "satisfactory" teacher. Id. at 28:22-17. Novlett-Morgan stated that she was mostly concerned with the number of instructional days that Ramirez missed and discussed the issue with him on many occasions. See id. at 57:21-17.

Ramirez has failed to assert any material fact that would prove that he was either regarded as being unable to perform his job as a Spanish teacher, or that he would be unable to perform a broad range of jobs. See Charneco, 2006 WL 148934, at *4 (granting summary judgment where "[p]laintiff asserted no material fact tending to show that defendant regarded her as being unable to perform a broad range of jobs."). Therefore, Ramirez has not proven a *prima facie* case of disability under the ADA.

### **"Qualified Individual" Within the Meaning of the ADA**

Even assuming, *arguendo*, that plaintiff was disabled within the meaning of the ADA, Ramirez has not established that he is a "qualified individual" within the meaning of the ADA. An individual is "otherwise qualified for a job if she is able to perform the essential functions of that job, either with or without a reasonable accommodation." Borkowski v. Valley Central Sch. Dist., 63 F.3d 131, 135 (2d Cir. 1995).

Ramirez has not demonstrated that he can perform an "essential function" of his employment position – showing up for work. Though all parties agree that Ramirez could perform his duties within the classroom as a teacher, Ramirez was absent from the classroom for nearly a third of the school year. To be a qualified individual, "[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate those skills by coming to work on a regular basis." Mescall v. Marra, 49 F. Supp.2d 365, 374 (S.D.N.Y. 1999) (quoting Tyndall v. Nat'l Educ. Ctrs. Inc., 31 F.3d 209, 213 (4th Cir. 1994)). An "individual is not qualified for his position if he is unable to come to work." Robarge v. Potter, No. 01 CV 0417 (SJ), 2002 WL 32061800, at *6 (E.D.N.Y. Mar. 14, 2002) (quoting Mazza, 108 F.Supp.2d at 175). The ADA does not require an employer to retain a person who fails to attend work on a regular basis because "attendance is an essential function of . . . employment." Bobrowsky v. New York City Bd. of Educ., No. 97 CV 874 (FB), 1999 WL 737919, at *4, 13 (E.D.N.Y. Sept. 16, 1999) (finding teacher not otherwise qualified due to excessive absenteeism; "[t]here could be no reasonable accommodation because attendance is an essential function of her employment."), aff'd mem., 213 F.3d 625 (2d Cir. 2000); see Daddazio v. Katherine Gibbs School, Inc., No. 98 CV 6861, 1999 WL 228344, at *5 (S.D.N.Y. Apr. 20, 1999) ("'regularly attending work' is an essential function of virtually every job"); Baker v. City of New York, No. 97 CV 5829, 1999 WL 33115, at *4 (E.D.N.Y. Jan 22, 1999) ("Some degree of regular, predictable attendance is fundamental to most jobs.") (quotation omitted); see also Mazza, 108 F.Supp.2d at 175 ("An individual is not qualified for his position if he is unable to come to work."); Mescall v. Marra, 49

F.Supp.2d 365, 374 (S.D.N.Y. 1999) (finding school counselor who missed forty-one

days of school over a two-and-a-half year period to be unqualified under the ADA);

Micari v. Trans World Airlines, Inc., 43 F.Supp.2d 275, 281 (E.D.N.Y. 1999) (Glasser, J.)

("It is not surprising that attendance has been found to be a prerequisite to performing

the essential functions of a job.").

There is a contrary line of cases holding that absenteeism is an "impermissible

pretext for the employee's disability" where the employer is aware that the employee's

"absences were related to a disability . . . ." Morris, 153 F.Supp.2d at 502 (collecting

cases). However, the instant case is distinguishable from that line of cases. Unlike here,

the plaintiff in Morris medically documented each of his sick days. Moreover, the

plaintiffs in the cases cited by Morris suffered from disabilities recognized under the

ADA. Ramirez, on the other hand, did not provide documentation for eighteen of the

sick days he took during the school year before the principal determined that Ramirez's

performance was unsatisfactory. See Def.'s Decl., Ex. T. Most of Ramirez's absences

were due to acute bronchitis, a temporary condition which is not recognized under the

ADA. See Amendola v. Henderson, 182 F.Supp.2d 263, 275 (E.D.N.Y. 2001) ("[S]hort-

term impairments in the ability to work . . . do not constitute a disability because they

are of too short a duration to be considered substantially limiting.").

In determining whether plaintiff could perform the essential functions of his job,

the Court is also required to take into account the policies of his employer with regard to

absences. See Shannon v. New York City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003)

("[C]onsiderable deference [must be given] to an employer's judgment regarding what

functions are essential for service in a particular position." (quotation and citation omitted)); see also 29 C.F.R. § 1630.2(n)(3). The report issued by the Chancellor's Committee states the policy of the school with regard to absences, that "[i]t is presumed that every absence by a teacher whether excused or not, whether reported or not, is disruptive to the school and injurious to the children's education." Def.'s Decl., Ex. K. It is apparent from the record that plaintiff's excessive absences prevented him from performing his essential functions as a teacher at August Martin, and thus, from being a qualified individual within the meaning of the ADA. Therefore, this Court must dismiss plaintiff's ADA claims.

### Ramirez's Claim Under the FMLA

Ramirez also alleges that the Board retaliated against him for "exercising his rights under the FMLA, in violation of 29 U.S.C. § 2615(a)(2)." Pl.'s Compl. ¶ 48. The statute of limitations under an FMLA claim is two years, three if there is a showing of willfulness. See 29 U.S.C. § 2617(c). To determine the timeliness of an adverse employment action, the statute of limitations must be measured from the time the plaintiff is notified of the alleged unlawful employment practice. See Delaware State Coll. v. Ricks, 449 U.S. 250, 259 (1980) ("Congress has decided that time limitations periods commence with the date of the 'alleged unlawful employment practice'" (quoting 42 U.S.C. § 2000e-5(e))); Smith v. United Parcel Serv. of Amer., 65 F.3d 266, 268 (2d Cir. 1995) (statute of limitations begins to run "on the date when the employee receives a definite notice of the termination" (citation omitted)). It must be made "apparent to

the employee that the notice states the official position of the employer." Id. (internal quote and citation omitted).

In the instant case, the unlawful employment practice complained of is Ramirez's termination. The Board argues that because Ramirez would "not [be] eligible to be rehired as a PPT for the next school year" due to the unsatisfactory rating, the date that Ramirez was given notice of the rating, June 22, 2001, must serve as effective notice of the termination. Def.'s Br. at 17; see also Ricks, 449 U.S. at 257-58 (determining termination effectuated where termination of employment was a "delayed, but inevitable consequence of the denial of tenure."). Alternatively, the Board argues that effective notice was given to Ramirez no later than early September when Ramirez was informed that August Martin no longer had a teaching position for him. See Def.'s Br. at 17 n. 8.

This Court need not determine whether the unsatisfactory rating effectuated a per se termination or whether awareness of the rating constituted sufficient notice. Ramirez filed this action on September 19, 2003, more than two years after he was informed that he no longer had a teaching position at August Martin. The time during which Ramirez appealed to the Chancellor's Committee does not toll the statute of limitations. See Ricks, 499 U.S. at 261 ("[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods. The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made." (internal citation omitted)). Because Ramirez

has not made a showing of willfulness, and Ramirez was informed prior to September 19, 2001, that he no longer had a position at August Martin, Ramirez's claim is untimely, and therefore dismissed.

## State Law Claims

Plaintiff's federal claims are dismissed. Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiff's pendent state law claims. See 28 U.S.C. § 1367(c). Plaintiff's New York State and New York City Human Rights Law claims are therefore dismissed without prejudice and may be renewed in the appropriate state court venue. See Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) ("We think that in the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York."); see also Temple v. Bd. of Educ. of the City of New York, 322 F.Supp.2d 277, 281-82 (E.D.N.Y. 2004) ("Having dismissed plaintiff's federal disability claims, this court declines to exercise supplemental jurisdiction over her related state law claims."); Thorner-Green v. New York City Dep't of Corrections, 207 F.Supp.2d 11, 15 (E.D.N.Y. 2002) (same).

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment and dismisses plaintiff's claims. The Clerk of the Court is hereby directed to enter judgment in favor of the defendant and to close the above-captioned action.

23

SO ORDERED.

Dated:      Brooklyn, New York
              March 30, 2006

                                _/s/_____
                                I. Leo Glasser
                                United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

<u>Counsel for the Plaintiff</u>

Saul D. Zabell, Esq.
Zabell & Associates, P.C.
4875 Sunrise Highway, Suite 300
Bohemia, NY 11716

<u>Counsel for the Defendant</u>

Cindy Switzer, Esq.
Holly Rachel Gerstenfeld, Esq.
The City of New York Law Department
100 Church Street, Room 2-117
New York, NY 10007